1  Nathaniel Kelly, Esq., SBN 262016
2  388 Market Street, Suite 1300
   San Francisco, CA 94111
3  Telephone:  (415) 336-3001
   Email:      esquire@natekelly.com
4
   Attorney for Plaintiffs Anna-Stina Kamlan and Edward Kamlan
5

6            **UNITED STATES DISTRICT COURT**

7           **NORTHERN DISTRICT OF CALIFORNIA**

8

9   ANNA-STINA KAMLAN and            )  Civil Action No.
10  EDWARD KAMLAN,                   )
                                     )  COMPLAINT FOR AN
11          Plaintiffs,              )  ACCOUNTING, VIOLATION OF
                                     )  THE SECURITES ACT OF 1933 AND
12          vs.                      )  SECURITIES ACT OF 1934,
                                     )  BREACH OF FIDUCIARY DUTY,
13                                   )  ELDER ABUSE, MONEY HAD AND
14  DAVID MARSHALL, an individual;   )  RECEIVED, COMMON LAW
    MARSHALL WEALTH                  )  FRAUD BY MISREPRESENTATION,
15  MANAGEMENT GROUP, INC., a        )  CONSPIRACY TO COMMIT
    dissolved California corporation;)  COMMON LAW FRAUD BY
16  PERRY C. SANTILLO JR., an        )  MISREPRESENTATION, COMMON
    individual; JOHN PICCARRETO, an  )  LAW FRAUD BY CONCEALMENT,
17  individual; ROBERT JAMISON, an   )  UNJUST ENRICHMENT,
18  individual; QUEST IRA, INC., a Texas )  NEGLIGENT
    corporation; FIRST NATIONALE     )  MISREPRESENTATION, AND
19  SOLUTION, LLC, a New York limited )  CONSPIRACY TO COMMIT
20  liability company; HIGH POINT    )  UNFAIR BUSINESS PRACTICES
    WEALTH MANAGEMENT, LLC, a        )  UNDER Cal. BUS. AND PROF.
21  Maryland limited liability company; )  CODE SECTIONS 17200 ET SEQ.
22  HIGH POINT INSURANCE             )
    SOLUTIONS, LLC, a Maryland limited )
23  liability company;  AND DOES 1-50, )  DEMAND FOR JURY TRIAL
24  INCLUSIVE                        )
                                     )
25                                   )
26          Defendants.              )
27  _____)
28

-1-
_____
**COMPLAINT**

Edward Kamlan ("Mr. Kamlan) and Anna-Stina Kamlan ("Mrs. Kamlan") (collectively, "Plaintiffs"), by and through their counsel, allege:

## PRELIMINARY STATEMENT

1.      Plaintiffs are retirees well over the age of 65 who are experiencing ongoing financial fraud perpetrated by defendants in relation to their investment portfolios.

2.      In or around August 2016, the sale of Defendant Marshall Wealth Management Group, Inc. ("MWM") to Defendant High Point Insurance Solution, LLC ("HPIS") effectuated a transfer in management and control of Plaintiffs' assets (along with the assets of many other MWM clients) from one set of defendants herein to another. The sale should never have taken place, and did so only with Defendant David Marshall's ("Mr. Marshall") utter failure to properly vet the new financial advisors to Plaintiffs.

3.      Following the sale, the new financial advisor defendants, entailing a dizzying array of individuals and entities more fully set forth below, (collectively, "Managing Defendants") convinced Plaintiffs to transfer certain assets into irregular securities that essentially entail unsecured loans. Managing Defendants took advantage of Plaintiffs' advanced age and Plaintiffs' reliance on Managing Defendants' purported collective financial expertise to do so.  Managing Defendants failed at all times to provide adequate disclosures to Plaintiffs regarding management, risks, or expected rates of return.

-2-

COMPLAINT

4.      As of the date of this action, Managing Defendants have never provided adequate documentation to Plaintiffs about Plaintiffs' investment accounts. More importantly, the funds that were in Plaintiffs' money appears to be simply gone. Despite Plaintiffs considerable efforts, no one among Managing Defendants has provided a reasonable explanation of what was done with Plaintiffs' money or when Plaintiffs might receive it back.

5.      Plaintiffs did, however, discover that Managing Defendants have, without explanation, rolled over their individual retirement accounts (Mr. and Mrs. Kamlan's individual retirement accounts are herein collectively referred to as the "IRAs") into an unsecured loan to a company controlled by certain Managing Defendants including without limitation Defendants First Nationale Solution, LLC ("FNS") and Quest IRA, Inc. ("Quest")

6.      As persons purporting to be the owners and managers of the various investment companies in control of Plaintiffs' assets, Managing Defendants have a fiduciary duty to account to Plaintiffs regarding details and whereabouts of such assets. Managing Defendants have utterly failed in that regard by completely ignoring Plaintiffs' numerous requests for an accounting of their investments and loans.

7.      The scheme set forth below to defraud Plaintiffs of a significant portion of their life savings – which was, until the point of sale of MWM to Managing

Defendants, competently and diligently managed – would be confounding to anyone, but particularly to those of advanced age such as Plaintiffs here.  This is true especially for Mr. Kamlan, currently 90 years of age, who has been diagnosed with Alzheimer's Disease. Defendants meanwhile, have significantly enriched themselves through such misappropriation.  Plaintiffs now bring this action in an attempt to right such brazenly wrongful conduct.

## PARTIES

8.      Plaintiffs are elderly individuals (over the age of 65) residing in the State of California.

9.      Defendant Mr. Marshall is an individual residing in California.

10.     Defendant MWH is a dissolved entity as of December 28, 2017, and was at all other relevant times a California Corporation, transacting business in California.

11.     Defendants Mr. Marshall and MWH are herein referred to as the "Marshall Defendants".

12.     Defendant Perry C. Santillo Jr. ("Mr. Santillo") is an individual residing in Rochester, NY.  He is a founder, member, manager, and CEO of Defendant FNS.

13.     Defendant John Piccarreto ("Mr. Piccarreto") is an individual residing in the state of Texas.  Mr. Piccarreto offered and sold securities in FNS.

14.     Defendant Robert Jamison ("Mr. Jamison") is an individual residing in the state of California.

15.     Defendant Quest IRA, Inc. ("Quest") is a Texas corporation based in Houston, Texas.

16.     Defendant FNS is a Michigan corporation.  FNS purports to conduct business in areas including leveraged investments, the financial services industry, insurance, and real estate development, among others.

17.     Defendant High Point Wealth Management, LLC ("HPWM") is a Nevada corporation operating in Baltimore County, Maryland.

18.     Defendant HPIS is a Nevada corporation operating in Baltimore County, Maryland.

19.     Defendants Mr. Santillo, Mr. Piccarreto, Mr. Jamison, Quest, FNS, HPWN, and HPIS are herein referred to as "Managing Defendants".

20.     The defendants listed above, in totality, including DOES 1 -50, are collectively referred to as "Defendants".

21.     Plaintiffs are informed and believe, and based on such information and belief aver, that all Defendants herein, including DOE Defendants 1 through 50, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as averred herein.

## JURISDICTION AND VENUE

COMPLAINT

22.     Plaintiffs bring this complaint under subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the matter in controversy involves a federal question under the Securities Act of 1933 and the Securities Exchange Act of 1934. This Court has pendant jurisdiction over Plaintiffs' other claims.

23.     Plaintiffs further bring this complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

24.     Venue is proper in this District pursuant to 28 U.S.C. § § 1391(a) and (c) because the conduct at issue took place in the northern district and Contracts between Defendants and Plaintiffs submit to the Jurisdiction of any Federal Court located in California.

## SUMMARY OF FACTS

25.     Plaintiffs are elderly retirees residing in Salinas, California who at all times relevant herein were over the age of 65.

26.     Plaintiffs' recent experience with their investment portfolios exemplifies the increasingly well-documented fraudulent conduct still being perpetrated against a wide variety of clients by Managing Defendants.

27.     For several years, Mr. Marshall (CRD #2843252) of MWM was Plaintiffs' financial advisor in Salinas, CA. The Marshall Defendants handled Plaintiffs' IRAs, several real estate investment trusts, a trust that Plaintiffs set up for an

autistic grandson, and a brokerage account.  Only the IRAs were transferred to Managing Defendants, and therefore the IRAs are the only assets at issue in this case.

28.     On or around August 12, 2016, the Marshall Defendants informed Plaintiffs in a meeting at Mr. Marshall's office in Salinas, CA that Mr. Marshall was planning to retire and was going to sell MWM, which was essentially a one-man show run by Mr. Marshall.  Mr. Marshall further informed Plaintiffs that, after performing "extensive research", Mr. Marshall had decided to sell MWM to HPIS, the CEO/proprietor of which was Mr. Santillo.

29.     Upon information and belief, Mr. Santillo commonly purchases of such books of business from investment professionals around the country, and then solicits investors from those books of business, as is the situation with Plaintiffs here.

30.     As a result of the sale, and with Plaintiffs' blessing given Mr. Marshall's assurance of HPIS's high degree of experience, competence and integrity, Plaintiffs gained confidence in Mr. Santillo and HPIS, and became comfortable with the idea that HPIS would be assuming management and control of the IRAs.

31.     In a subsequent meeting at Mr. Marshall's office, on or around August 22, 2016, Mr. Santillo and two of HPIS's local employees, Mr. Piccarreto (CRD# 6276418) and Mr. Jamison (CRD#5793591), convinced Plaintiffs to move Mr.

Kamlan's IRA to FNS. (They also agreed in principle that Mrs. Kamlan's IRA would also be transferred to FNS but for a reason that Plaintiffs do not recall, such transfer would be done at a later time.)  They further informed Plaintiffs that the IRAs would be managed by a separate company, Quest.  Mr. Santillo, Mr. Piccarreto, and Mr. Jamison convinced Mr. Kamlan (with Mrs. Kamlan also present) that such transfer of Plaintiffs' IRAs was a more appropriate investment vehicle due to a lower fee structure and the higher rate of return (4%).  Mr. Santillo did most of the talking in regards to representations about FNS as an investment vehicle, while Mr. Piccarreto and Mr. Jamison played a supporting role.

32.     HPIS transferred Mr. Kamlan's IRA was transferred to FNS on or about September 2, 2016.  The total value of Mr. Kamlan's IRA at the time, and the amount accordingly transferred, was $342,350.38.  There was a penalty of $21,302.63 for the early disbursement; accordingly, FNS stated that it would reimburse the penalty via a "bonus payment' into the IRA.  This was done on September 2, 2016 in the amount of $34,235.04.  Mr. Kamlan received his 2016 required minimum distribution ("RMD") payment of $28,139.25 on December 5, 2016 – as scheduled – via an ACH wire transfer.  Mr. Kamlan later received a statement dated April 13, 2017.

33.     From in or around November 2016 to in or around January 2017, Plaintiffs met on multiple occasions gwith Mr. Santillo and Mr. Jamison to discuss the IRAs.

34.     On or around January 27, 2017, HPIS also transferred Mrs. Kamlan's IRA to FNS, with the understanding that it too would to be managed by Quest.  The total value of Mrs. Kamlan's IRA at the time, and the amount accordingly transferred, was $159,399.09.  Similar to Mr. Kamlan's IRA, the penalty for the early disbursement was to be offset by a "bonus payment" of $15,939.93, which posted to the benefit of Mrs. Kamlan on January 27, 2017.

35.     Plaintiffs expected to be paid an RMD from their IRA on or around December 5, 2017, as they were scheduled to receive such payment on that date.  Accordingly, they contacted HPIS by phone and email to discuss the 2017 RMDs related to their IRAs; HPIS accordingly stated that it "would check into it".  Given a lack of response from HPIS, Plaintiffs on December 16, 2017 followed up with more emails, which yielded similar radio silence from HPIS.  By Christmas, Plaintiffs became more concerned as they still had not received a response.

36.     Plaintiffs, through having their grown children assist them with research, discovered that Mr. Santillo was not only the CEO of HPIS but also of FNS.  Plaintiffs had not been previously informed of Mr. Santillo's interest in FNS, and started to become more concerned about and suspicious of Managing Defendants.

37.     Plaintiffs further discovered that Mr. Piccarreto had his broker license suspended by FINRA and that the company he previously worked for, First American Securities (CRD# 35841) ("FAS") was expelled from FINRA.  Plaintiffs

-9-

further discovered that Mr. Jamison also worked for FAS during the same period, and that Mr. Santillo was listed as an indirect owner of FAS.

38.     Given the new information and still no response from HPIS regarding Plaintiffs' RMDs, Plaintiffs called FNS on December 27, 2017 and spoke to a woman named Brianna.  Plaintiffs asked for the account information, disbursements, and balances.  Briana indicated that someone else would be the authorized person to access the account and provide that information.  She further stated that she would pass along the request and have someone call back the next day.  Predictably, and troublingly, that call never came.  Plaintiffs next emailed Mr. Piccarreto and eventually got a response that indicated that he would provide the RMDs and account information.

39.     On January 6, 2018, Mrs. Kamlan received a check from Quest in the amount of $8,199.95.  However, Plaintiffs did not receive a statement or a confirmation that this was the RMD for 2017.  Plaintiffs' son contacted Quest, who indicated that the payment was coded as an interest payment.  Given Plaintiffs were not getting a response from Mr. Piccarreto, they forwarded the correspondence to Mr. Santillo but also got no response.  To date, Plaintiffs have not received correspondence or definite information from HPIS or FNS as to what happened to Mr. Kamlan's RMD and where his IRA account is.  Also, despite

-10-

receiving Mrs. Kamlan's RMD, albeit too late to be included in the tax year 2017, Plaintiffs are also uncertain as to the status and location of Mrs. Kamlan's IRA.

40.     Given the above, Plaintiffs have filed an IC3 Complaint with the FBI as well as an Elder Abuse complaint with FINRA (Case #: CAS-1780322-X1N4Q5 CRM:0069000000154).  Complaints have also been filed with the Securities and Exchange Commission, the Monterey County District Attorney (specifically with Matthew L'Heureux, Deputy District Attorney), the California Department of Insurance, the California Department of Business Oversight, the New York Attorney General, the New York State Department of Financial Services, the Texas Department of Insurance, and the Texas State Securities Board.  The Maryland Attorney General Brian E. Frosh announced that his Securities Division has issued a Summary Order to Cease and Desist and Order to Show Cause against Mr. Santillo and his companies HPWM and HPIS.  *See*, http://www.marylandattorneygeneral.gov/Securities%20Actions/2018/highpoint_summary_order_020118.pdf

41.     On March 30, 2018, Mr. Marshall contacted Plaintiffs by phone to invite them to a meeting at Ellie's restaurant in Salinas.  Plaintiffs obliged, attending this meeting along with their son.  Mr. Marshall was joined by a "friend" Alex Teodoro ("Mr. Teodoro") from LPL Financial.  This meeting was attended by approximately 25 people who Mr. Marshall later referred to as about 30% of his

clients.  Mr. Marshall conducted the meeting in a "Tony Robbins" style and stated that he had been aware that there have been serious issues with Mr. Santillo, and that he is aware that financial malfeasance has taken place.  Mr. Marshall stated that wanted to help, but was under a gag order that kept him from doing anything about this until a few days before this meeting.  Mr. Marshall revealed that Mr. Teodoro flew down to Monterey on "his plane" to help Mr. Marshall out, and that he and Mr. Teodoro are long-time friends and business colleagues who recently walked/jogged the Grand Canyon rim to rim. Mr. Marshall further stated that he had recently been on a vacation down to South America where he rode a motorcycle with his daughter through several countries.  Mr. Marshall opined that he has absolutely no obligation to help out but is doing so as his clients are "family" to him.

42.    Mr. Marshall revealed that his FINRA license is currently not active, nor does it need to be as he will be working under Mr. Teodoro as a consultant to Mr. Teodoro and/or LPL Financial, one or both of whom would be compensating Mr. Marshall for his consultant services.

43.    Still at the same meeting, Mr. Teodoro stated that he would bring any needed full resources to bear including attorneys if needed.  Mr. Marshall stated a desire to meet with all of his former clients individually to review all of their investments and will produce a report for them of his analysis of what transpired

and what their options are.  He claimed that this would be done free of charge.  Mr. Teodoro would in turn be able to help out and assist everyone with their financial plans going forward.

44.     Mr. Marshall stated that he sold MWM to Mr. Santillo and had vetted him appropriately, and that he was unaware of any red flags regarding Mr. Santillo at the time of sale.

45.     Mr. Marshall stated that he was present at his office for several months as the transition took place. Mr. Marshall further stated that he owns the building where his former office is located, which HPIS is now occupying, and that Mr. Santillo is late paying him rent.  Mr. Marshall stated that Mr. Santillo had "hounded" Mr. Marshall, which influenced Mr. Marshall to ultimately sell MWM to Mr. Santillo.

46.     Further underscoring Plaintiffs' concerns about the status of their IRAs, on May 24, 2018, Plaintiffs received a letter from Quest informing Plaintiffs that Mr. Santillo had been sanctioned over $4 million and that Plaintiffs may elect to reduce the amount of their IRAs to $1 if Plaintiffs and/or Plaintiffs' representatives believed that the sum of the IRAs was not collectable.

47.     Additionally, on or around June 19, 2018, the SEC filed a complaint in the United States District Court for the Southern District of New York against Perry Santillo, First Nationale Solution, LLC, John Piccarreto, among other individuals

and entities, alleging securities fraud and other violations.  The complaint states that Mr. Santillo has misappropriated a total of $13.4 million, while Mr. Piccaetto misappropriated at least $1.3 million. This complaint describes the jet-setting lifestyle of Mr. Santillo, including a song that Mr. Santillo had commissioned about him in regards to such lifestyle. The lyrics of the song include, which refer to Mr. Santillo as "King Perry", endeavor to describe his lifestyle: "ten thousand dollar suits everywhere he rides" and "pop the champagne in LA, New York to Florida; buy another bottle just to spray it all over ya".

48.    The following allegations are based on information and belief. This action arises from actions surrounding the management and control of the IRAs and professional advice related thereto.

## GENERAL ALLEGATIONS

49.    This action arises from the transfer of the IRAs managed by Mr. Marshall to entities under the direction, control, and/or coordination of Mr. Santillo, Mr. Jamison, and Mr. Piccarreto, and persons not known to Plaintiffs at this time.

50.    Defendants took funds from the Plaintiffs under the Securities Act of 1933 and the Securities Exchange Act of 1934.

51.    Managing Defendants encouraged Plaintiffs to lend and invest money into entities under Managing Defendants' control without adequate disclosures regarding management, risks, or expected rates of return.

52.     Managing Defendants took actions to ensure their own financial benefit, to the detriment of Plaintiffs.

53.     To date, Plaintiffs have not received adequate documentation of their IRAs and loans to Managing Defendants, and Managing Defendants have provided no reasonable explanation of what was done with Plaintiffs' money or when Plaintiffs might receive it back.  Plaintiffs have not yet received a single full and accurate accounting statement from Defendants regarding the status of the IRAs, nor of the subsequent unsecured loan to FNS.  Further, Defendants have failed to provide an accounting despite numerous requests from Plaintiffs.

## FIRST CLAIM FOR RELIEF

### Accounting

### (Against Managing Defendants)

54.     Plaintiffs hereby incorporate paragraphs 1-52 as set forth herein.

55.     From the time Managing Defendants took over control of Plaintiffs' investments to date, Plaintiffs have never received comprehensive documentation of their investments and no explanation of what was done with it other than Defendants' claims that their money has been invested.

56.     As persons and entities purporting to be investing and receiving money on behalf of Plaintiffs, Defendants had a duty to account to Plaintiffs for the details and whereabouts of the funds invested by them.

57.     As a person and entity taking funds from Plaintiffs under the cloak of Regulation D of the Securities Act of 1933, and as an entity incorporated under the laws of California, Defendants owed but never provided substantial reporting and disclosure information to Plaintiffs.

58.     Wherefore, Plaintiffs seek judgment against defendants for a full accounting, to be provided within 30 days of the entry of judgment, and such other relief as the Court deems fair and equitable.

## SECOND CLAIM FOR RELIEF

### Violation of the Securities Acts of 1933 and 1934

### (As to Managing Defendants)

59.     Plaintiffs hereby incorporate paragraphs 1-61 as set forth herein.

60.     The transfer of Plaintiffs' IRAs to FNS entailed a sale of securities as defined by the Securities Exchange Act of 1933 and the Securities Exchange Act of 1934.

61.     Securities sold in the United States that are not registered with the Securities and Exchange Commission "SEC") under Regulation D must conform to the provisions of SEC Regulation D ("Reg. "D").

62.     Reg. D Rule 502 states that unregistered securities must be preceded by disclosures that approximate those which would be disclosed in a formal registration.

63.     Defendants, through the transfer of Plaintiffs assets from their respective IRAs to the unsecured loan to FNS, sold unregistered securities, supported by a February 2, 2018 press release by Maryland Attorney General Brian Frosh.  Prior to selling such securities to Plaintiffs, Defendants failed to make an adequate disclosure to Plaintiffs regarding company risks, management, or before they purchased the securities.

64.     The press release states that the Securities Division of the Maryland Attorney General's office is accordingly seeking sanctions against Mr. Santillo, including fines and a permanent bar from the securities and investment business in Maryland.

65.     Mr. Santillo and his colleagues within Managing Defendants made the false, deceptive, and misleading statements and omissions were made with knowledge that Plaintiffs would never receive any profits from these unsecured loans.

66.     The aforementioned acts were undertaken in violation of Section 12(a) of the Securities Act of 1933, section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 adopted pursuant thereto.

### THIRD CLAIM FOR RELIEF

**Breach of Fiduciary Duty**

**(As to all Defendants)**

67.     Plaintiffs incorporate paragraphs 1 through 69 as though set forth herein.

-17-

68.     As persons purporting to be the owners and managers of the various

investment companies they are associated with, Managing Defendants have an

ongoing fiduciary duty to account to Plaintiffs for the details and whereabouts of

the funds invested by them. Managing Defendants have a further duty to distribute,

without limitation, RMDs to Plaintiffs.

69.     At all times relevant herein, Managing Defendants breached their fiduciary

duty to Plaintiffs by failing to provide such an accounting upon request, despite

Plaintiff's numerous attempts.

70.     Managing Defendants additionally breached their fiduciary duty to Plaintiffs

by failing to timely distribute, without limitation, RMDs to Plaintiffs.

71.     Managing Defendants further breached their fiduciary by taking control of

Plaintiffs' IRAs and preventing Plaintiffs access to the funds within the IRAs, and

leaving Plaintiffs to wonder if and when Plaintiffs will regain control over the

IRAs.

72.     As a result of the above breaches of fiduciary duty by Managing Defendants,

Plaintiffs have suffered and continue to suffer damages in an amount to be

established at trial.

73.     Meanwhile, Marshall Defendants, as previous financial advisors to

Plaintiffs, had a fiduciary duty to Plaintiffs to ensure that, in the event that

Marshall Defendants sold the entity that had management and control over

Plaintiffs' assets, that the purchaser of such entity was a competent and trustworthy candidate to assume such management and control.

74.     Despite Mr. Marshall's representations to the contrary, Marshall Defendants breached their fiduciary duty to Plaintiffs by failing to properly vet the credentials of Managing Defendants, including without limitation Mr. Santillo and HPIS.

75.     As a result of the above breaches of fiduciary duty by Managing Defendants, Plaintiffs have suffered and continue to suffer damages in an amount to be established at trial.

## FOURTH CLAIM FOR RELIEF

### Elder Abuse

### (As to Managing Defendants)

76.     Plaintiffs incorporate paragraphs 1 through 78 as though set forth herein.

77.     Managing Defendants violated the Elder Abuse and Dependent Adult Civil Protection Act by taking financial advantage of Plaintiffs.

78.     Following the sale of MWM to HPIS, Plaintiffs consented to Defendants' management and control of the IRAs.  Since assuming such control, Defendants have grossly mismanaged the IRAs to the point of committing financial malfeasance.  Plaintiffs have no idea as to the status of the IRAs, and have been denied timely allocation of their RMDs by Managing Defendants.

79.     This has left Plaintiffs confused, emotionally distraught, and struggling to put the pieces together as to how they can regain as much of the IRAs as possible.

80.     At all relevant times, including when Managing Defendants assumed management and control over the IRAs, both Plaintiffs were 65 years of age or older.

81.     Plaintiffs have already suffered harm, and continue to do so, in an amount to be established at trial.

82.     Managing Defendants' conduct, as above, was clearly a substantial factor in causing Plaintiff's harm.

## FIFTH CLAIM FOR RELIEF

### Money Had and Received

### (As to Managing Defendants)

83.     Plaintiffs incorporate paragraphs 1 through 85 as though set forth herein.

84.     Shortly after the time that Managing Defendants took over management and control of the IRAs, Managing Defendants have obscured the location of the IRAs, leaving Plaintiffs with no idea if, when, or how Plaintiffs will recover control of the IRAs – nor how much they will ultimately recover.  The IRAs are, at the present, and have for over one year, been gone, despite Plaintiffs' ongoing efforts.

85.     Managing Defendants are currently using the IRAs to their own benefit, and currently owe to Plaintiffs the full value of the IRAs, with the interest rate of 10% per annum from on or around September 1, 2016.

## SIXTH CLAIM FOR RELIEF

### Common Law Fraud by Misrepresentation

(Against Managing Defendants)

86.     Plaintiffs incorporate paragraphs 1 through 88 as though set forth herein.

87.     In or around August 22, 2016, at an in-person meeting in Mr. Marshall's office in Salinas, CA, Mr. Santillo and two of HPIS's local employees, Mr. Piccarreto (CRD# 6276418) and Mr. Jamison (CRD#5793591), convinced Plaintiffs to move Mr. Kamlan's IRA to FNS. (They also agreed in principle that Mrs. Kamlan's IRA would also be transferred to FNS but for a reason that Plaintiffs do not recall, such transfer would be done at a later time.)  They further informed Plaintiffs that the IRAs would be managed by a separate company, Quest.  Mr. Santillo, Mr. Piccarreto, and Mr. Jamison convinced Mr. Kamlan (with Mrs. Kamlan also present) that such transfer of Plaintiffs' IRAs was a more appropriate investment vehicle due to a lower fee structure and the higher rate of return (4%).  Mr. Santillo did most of the talking in regards to representations about FNS as an investment vehicle, while Mr. Piccarreto and Mr. Jamison played a supporting role.

88.     As a result of the representations made by Mr. Santillo, Mr. Piccarreto, and Mr. Jamison – acting in both their individual capacities and in the capacity of HPIS, FNS, Quest, and  HPWM – HPIS transferred Mr. Kamlan's IRA was transferred to FNS on or about September 2, 2016.

89.     This representation was deliberately false and misleading, with the express purpose of deceiving Plaintiffs and inducing Plaintiffs to consent in a fraudulent scheme.

90.     Plaintiffs' RFAs are now apparently tied up in an unsecured loan to FNS, and other than the aforementioned RMDs and bonus payments, there has been no return whatsoever to date.  Instead of being a "more appropriate investment vehicle" Managing Defendants converted the IRAs into an unsecured loan to FNS, an institution that they themselves owned. Managing Defendants failed to disclose this interest and Plaintiffs.  FNS turned out to be a fraudulent investment scheme in the sense that Plaintiffs are now utterly unable to account for the funds that were in the IRAs.

91.     Managing Defendants knew that the representation that an unsecured loan to FNS was a "more appropriate investment vehicle" than Plaintiffs simply keeping their money was in an IRA was false when they made it.  Managing Defendants knew that this was an unsecured loan, and as financial professionals they knew that

-22-

an unsecured loan is a risky, and therefore a *less* appropriate investment vehicle than an IRA.

92.     Managing Defendants intended to deceive Plaintiffs and intended for Plaintiffs to rely on the representation in order to be permitted to transfer the IRAs to FNS.

93.     Plaintiffs did in fact rely on Managing Defendants' representations as true.

94.     Plaintiffs belief of the truth value of Managing Defendants' representations as true was reasonable, given that Marshall Defendants, whom Plaintiffs had trusted for years with the IRAs, had represented that Managing Defendants, including without limitation Mr. Santillo and HPIS, were competent and trustworthy.

As a direct and proximate result of Managing Defendants' fraudulent representation, and Plaintiffs' reliance thereon, Plaintiffs have been damaged, and continue to be damaged, by an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

**Conspiracy to Commit Common Law Fraud by Misrepresentation**

(Against Managing Defendants)

95.     Plaintiffs incorporate paragraphs 1 through 97 as though set forth herein.

96.     In or around August 22, 2016, at an in-person meeting in Mr. Marshall's office in Salinas, CA, Mr. Santillo and two of HPIS's local employees, Mr.

-23-

Piccarreto (CRD# 6276418) and Mr. Jamison (CRD#5793591), convinced Plaintiffs to move Mr. Kamlan's IRA to FNS. (They also agreed in principle that Mrs. Kamlan's IRA would also be transferred to FNS but for a reason that Plaintiffs do not recall, such transfer would be done at a later time.)  They further informed Plaintiffs that the IRAs would be managed by a separate company, Quest.  Mr. Santillo, Mr. Piccarreto, and Mr. Jamison convinced Mr. Kamlan (with Mrs. Kamlan also present) that such transfer of Plaintiffs' IRAs was a more appropriate investment vehicle due to a lower fee structure and the higher rate of return (4%).  Mr. Santillo did most of the talking in regards to representations about FNS as an investment vehicle, while Mr. Piccarreto and Mr. Jamison played a supporting role.

97.     As a result of the representations made by Mr. Santillo, Mr. Piccarreto, and Mr. Jamison – acting in both their individual capacities and in the capacity of HPIS, FNS, Quest, and HPWM – HPIS transferred Mr. Kamlan's IRA was transferred to FNS on or about September 2, 2016.

98.     This representation was deliberately false and misleading, with the express purpose of deceiving Plaintiffs and inducing Plaintiffs to consent in a fraudulent scheme.

99.     Plaintiffs' RFAs are now apparently tied up in an unsecured loan to FNS, and other than the aforementioned RMDs and bonus payments, there has been no

return whatsoever to date.  Instead of being a "more appropriate investment vehicle" Managing Defendants converted the IRAs into an unsecured loan to FNS, an institution that they themselves owned. Managing Defendants failed to disclose this interest and Plaintiffs.  FNS turned out to be a fraudulent investment scheme in the sense that Plaintiffs are now utterly unable to account for the funds that were in the IRAs.

100.    Managing Defendants knew that the representation that an unsecured loan to FNS was a "more appropriate investment vehicle" than Plaintiffs simply keeping their money was in an IRA was false when they made it.  Managing Defendants knew that this was an unsecured loan, and as financial professionals they knew that an unsecured loan is a risky, and therefore a *less* appropriate investment vehicle than an IRA.

101.    Managing Defendants intended to deceive Plaintiffs and intended for Plaintiffs to rely on the representation in order to be permitted to transfer the IRAs including without limitation Plaintiffs' RFAs, to FNS.

102.    Plaintiffs did in fact rely on Managing Defendants' representations as true.

103.    Plaintiffs belief of the truth value of Managing Defendants' representations as true was reasonable, given that Marshall Defendants, whom Plaintiffs had trusted for years with the IRAs, had represented that Managing Defendants,

including without limitation Mr. Santillo and HPIS, were competent and trustworthy.

104.   Managing Defendants and each of them did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and the above-alleged agreement.

105.   Managing Defendants and each of them furthered the conspiracy by cooperating and acting in concert with each other, in that each of them partipated in the scheme to defraud Plaintiffs by the acts herein alleged.

106.   As a direct and proximate result of Managing Defendants' fraudulent representation, and Plaintiffs' reasonable reliance thereon, Plaintiffs have been damaged, and continue to be damaged, by an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### Fraud by Concealment

(Against Defendant Perry Santillo)

107.   Plaintiffs incorporate paragraphs 1 through 106 as though set forth herein.

108.   Mr. Santillo and Plaintiffs were in a fiduciary relationship of financial advisor and clients.

109.   At the time that Mr. Santillo convinced Plaintiffs to transfer their IRAs to FNS, Mr. Santillo intentionally failed to disclose that he was the CEO of not only HPIS, but also of FNS.

-26-

110.    Plaintiffs were not aware of this fact at the time Mr. Santillo convinced Plaintiffs to make the transfer.

111.    Mr. Santillo intended to deceive Plaintiffs by concealing this fact.

112.    Had this fact been disclosed, Plaintiffs would have reasonably behaved differently.  Specifically, they would not have allowed the transfer to go through because they would have understood there to be a conflict of interest of Mr. Santillo having a prominent position in both companies.  At very least, they would have sought independent advice, which, if competent, would have steered them away from FNS.

113.    Plaintiffs were harmed by such concealment by Mr. Santillo, for an amount to be proven at trial.

114.    Mr. Santillo's concealment of this fact was a substantial factor in causing Plaintiffs' harm.

115.    At the time that Mr. Santillo also convinced Plaintiffs to transfer their IRAs to FNS, Mr. Santillo intentionally failed to disclose that by transferring their IRAs to FNS, Plaintiffs were transferring their assets into an unsecured loan.

116.    Plaintiffs were not aware of that the transfer to FNS entailed an unsecured loan at the time Mr. Santillo convinced Plaintiffs to make the transfer.

117.    Mr. Santillo intended to deceive Plaintiffs by concealing this fact.

118.   Had this fact been disclosed, Plaintiffs would have reasonably behaved differently.  Specifically, they would not have allowed the transfer to go through because they had a basic understanding that an unsecured loan is an inherently risky investment vehicle.  At very least, they would have sought independent advice, which, if competent, would have steered them away from FNS.

119.   Plaintiffs were harmed by such concealment by Mr. Santillo, for an amount to be proven at trial.

120.   Mr. Santillo's concealment of this fact was a substantial factor in causing Plaintiffs' harm.

## NINTH CLAIM FOR RELIEF

### Negligent Misrepresentation

### (Against Managing Defendants)

121.   Plaintiffs incorporate paragraphs 1 through 125 as though set forth herein.

122.   In or around August 22, 2016, at an in-person meeting in Mr. Marshall's office in Salinas, CA, Mr. Santillo and two of HPIS's local employees, Mr. Piccarreto (CRD# 6276418) and Mr. Jamison (CRD#5793591), convinced Plaintiffs to move Mr. Kamlan's IRA to FNS. (They also agreed in principle that Mrs. Kamlan's IRA would also be transferred to FNS but for a reason that Plaintiffs do not recall, such transfer would be done at a later time.)  They further informed Plaintiffs that the IRAs would be managed by a separate company,

Quest.  Mr. Santillo, Mr. Piccarreto, and Mr. Jamison convinced Mr. Kamlan (with Mrs. Kamlan also present) that such transfer of Plaintiffs' IRAs was a more appropriate investment vehicle due to a lower fee structure and the higher rate of return (4%).  Mr. Santillo did most of the talking in regards to representations about FNS as an investment vehicle, while Mr. Piccarreto and Mr. Jamison played a supporting role.

123.   As a result of the representations made by Mr. Santillo, Mr. Piccarreto, and Mr. Jamison – acting in both their individual capacities and in the capacity of HPIS, FNS, Quest, and HPWM – HPIS transferred Mr. Kamlan's IRA was transferred to FNS on or about September 2, 2016.

124.   Managing Defendants had no reasonable belief for making this representation when they made it.

125.   Plaintiffs' RFAs are now apparently tied up in an unsecured loan to FNS, and other than the aforementioned RMDs and bonus payments, there has been no return whatsoever to date.  Instead of being a "more appropriate investment vehicle" Managing Defendants converted the IRAs into an unsecured loan to FNS, an institution that they themselves owned. Managing Defendants failed to disclose this interest and Plaintiffs.  FNS turned out to be a fraudulent investment scheme in the sense that Plaintiffs are now utterly unable to account for the funds that were in the IRAs.

126.   Managing Defendants knew that the representation that an unsecured loan to FNS was a "more appropriate investment vehicle" than Plaintiffs simply keeping their money was in an IRA was false when they made it.  Managing Defendants knew that this was an unsecured loan, and as financial professionals they knew that an unsecured loan is a risky, and therefore a *less* appropriate investment vehicle than an IRA.

127.   Managing Defendants intended to deceive Plaintiffs and intended for Plaintiffs to rely on the representation in order to be permitted to transfer the IRAs including without limitation Plaintiffs' RFAs, to FNS.

128.   Plaintiffs did in fact rely on Managing Defendants' representations as true.

129.   Plaintiffs belief of the truth value of Managing Defendants' representations as true was reasonable, given that Marshall Defendants, whom Plaintiffs had trusted for years with the IRAs, had represented that Managing Defendants, including without limitation Mr. Santillo and HPIS, were competent and trustworthy.

As a direct and proximate result of Managing Defendants' fraudulent representation, and Plaintiffs' reliance thereon, Plaintiffs have been damaged, and continue to be damaged, by an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

### Negligence

-30-

(Against Marshall Defendants)

130.   Plaintiffs incorporate paragraphs 1 through 132 as though set forth herein.

131.   In making the decision to sell MWM to Managing Defendants, including without limitation Mr. Santillo and HPIS, the Marshall defendants were negligent in regards to Plaintiffs and the IRAs.

132.   As a financial advisor, the Marshall defendants had a duty to act primarily for the benefit of their clients.  As a fiduciary, the Marshall Defendants had a duty to exercise the highest standard of care, including the duty to engage only in activities that promote fair, equitable, and ethical principles.

133.   By selling MWM to HPIS/Mr. Santillo, and therefore management and control over the IRAs, Mr. Marshall, acting in both his individual capacity and that of principal of MWM, violated his duties of reasonable care to Plaintiffs.

134.   Mr. Marshall has stated to Plaintiffs and various other clients that that he appropriately vetted Mr. Santillo.  However, a simple Google search of Mr. Santillo at the time of the sale would have brought up sufficient red flags to indicate that Mr. Santillo had already been subject to various disciplinary measures which clearly called his ethical practices into question.  For example, and without limitation, Mr. Marshall could have discovered that Mr. Santillo has never been registered as a broker-dealer, broker-dealer agent, investment adviser, or investment adviser in his home state of Maryland. *See*

-31-

http://www.marylandattorneygeneral.gov/Securities%20Actions/2018/highpoint_s

ummary_order_020118.pdf

135.   Mr. Marshall was a financial advisor who managed Plaintiffs' funds for

about 10 years, and should accordingly be held to a high standard of reasonable

care as to choosing his successor in managing the IRAs. As a fellow financial

advisor, and someone entrusted with the financial futures of elderly persons in the

position of Plaintiffs, Mr. Marshall should have both uncovered and recognized

these red flags.

136.   As a direct and proximate result of Mr. Marshall's negligence, as alleged

above, Plaintiffs have been damaged, and continue to be damaged, by an amount to

be determined at trial.

137.   The causal connection is clear:  But for Mr. Marshall's decision to make the

sale to Mr. Santillo, who at all relevant times in this action had a well-documented

history of dubious ethical practice in the financial field, none of the damages to

Plaintiffs would have occurred.

## ELEVENTH CLAIM FOR RELIEF

**Conspiracy to Violate California's Unfair Competition Law, Cal. Bus. & Prof.**

**Code Sections 17200 et seq.**

(Against Managing Defendants)

138.   Plaintiffs incorporate paragraphs 1 through 140 as though set forth herein.

-32-

139.   The scheme to defraud Plaintiffs of their IRAs required multiple actors, including without limitation each of the individuals and entity defendants among Managing Defendants.

140.   As set forth above, Managing Defendants, and each of them, orchestrated the scheme through the creation and maintenance of FNS as a destination for Plaintiffs' IRAs.

141.   Defendants flagrantly breached the trust and confidence of Plaintiffs by committing this intentional act of fraud and deception as to the circumstances regarding FNS.

142.   As a result, Managing Defendants, and each of them, have acted unlawfully, fraudulently, and/or unfairly within the meaning of California Business and Professions Code Sections 17200 et seq as alleged herein.

143.   As a direct and proximate result of violations by Managing Defendants of California Business and Professions Code Sections 17200 et seq, Plaintiffs have suffered, and continue to suffer, damages by an amount to be proved at trial.

**WHEREFORE**, Plaintiffs seeks judgment against Defendants, and each of them, as follows:

1.  For compensatory damages

2.  For treble damages

3.  For punitive damages

4.  For pre-judgment interest

5.  For an accounting

6.  For injunctive relief that the IRAs be returned, in their entirety, to the possession and control of Plaintiffs

7.  For restitution and disgorgement

8.  For all costs and fees incurred in prosecuting this Complaint; and

9.  For such other and further relief as this Court deems just and proper

Dated:  July 27, 2018                    **LAW OFFICES OF NATHANIEL KELLY**

By:_____

Nathaniel G. Kelly

Attorney for Plaintiffs

Edward Kamlan and Anna-Stina Kamlan

**DEMAND FOR JURY TRIAL**

-34-

Plaintiffs hereby demands a trial by jury.

Dated:  August 28, 2018                 **LAW OFFICES OF NATHANIEL KELLY**

By: *Nate Kelly*

Nathaniel G. Kelly

Attorney for Plaintiffs

Edward Kamlan and Anna-Stina Kamlan

**COMPLAINT**